Ernest Edward FEIL, petitioner, Respondent,

v.

**COMMISSIONER OF PUBLIC SAFETY, Appellant.**

No. C3–85–1632.

Court of Appeals of Minnesota.

March 18, 1986.

Edward W. Simonet, III, Stillwater, for respondent.

Hubert H. Humphrey, III, Atty. Gen., Joel A. Watne, Sp. Asst. Atty. Gen., St. Paul, for appellant.

Heard, considered and decided by POPO-VICH, C.J., and WOZNIAK and SEDG-WICK, JJ.

## OPINION

SEDGWICK, Judge.

Respondent's driver's license was revoked when his Intoxilyzer 5000 test disclosed an alcohol concentration of .12. Respondent petitioned for judicial review. The trial court rescinded the revocation, finding that the Commissioner did not make a prima facie showing that the test was reliable. The Commissioner of Public Safety appeals. Respondent did not file a brief. We determine the case pursuant to Minn.R.Civ.App.P. 142.03. We reverse.

## FACTS

Respondent stipulated at the implied consent hearing that the only issue was the validity of the breath test. Officer Arthur G. Sievert, a certified Intoxilyzer 5000 operator, administered the test to respondent. The officer followed the procedures set by the Bureau of Criminal Apprehension.

The diagnostic check at the start of the test indicated that the instrument was working properly and was at the proper operating temperature. The first air blank test produced the anticipated reading of .000, as did all other air blanks.

Respondent provided the first of two required adequate breath samples which produced readings of .134 and .136 alcohol concentration. After a second air blank, a calibration standard test was run by connecting a plastic hose leading from a container of simulator solution to the Intoxilyzer machine. Although this solution is certified to have an alcohol concentration of .11, the Intoxilyzer produced readings of .052 and .052. Because these readings were unacceptably low, Officer Sievert checked the fit of the plastic hose connecting the simulator solution to the Intoxilyzer and found the end to be too loose to provide an airtight fit.

After the "cal standard" and a third air blank, respondent gave the second required adequate sample producing readings of .129 and .132 alcohol concentration. A fourth air blank was run, and the instrument printed out the test record. The correlation between the two sample results was 97%. The instrument took the lowest of the four readings, truncated to two decimals and reported .12 as a final result.

Officer Sievert then cut about an inch off the plastic hose and reattached it to the simulator to have a tight fit. He then ran an "ACA" test[1] on the simulator solution. The Intoxilyzer tested the simulator solution and obtained the anticipated .110 alcohol concentration. He repeated the air blank and "cal standard" again with the same results.

Officer Sievert had no indication that the Intoxilyzer itself had malfunctioned in any way.

According to the Intoxilyzer log, the only simulator test result which was outside the prescribed range was the one between respondent's breath samples.

Robert Mooney, a laboratory analyst for the BCA had helped train Sievert in the operation of the Intoxilyzer. He testified that respondent's test record disclosed a proper test sequence, although the results of the simulator test were not proper. He said Officer Sievert had been trained to follow one of two procedures in such situations. First, if he felt the low reading resulted from a leak in the system instead of a malfunction in the instrument itself, he should run an ACA test immediately after the breath test as he did here. The second alternative was to run the entire test over. Either procedure would be proper. Mooney believed Sievert correctly diagnosed and corrected the cause of the low simulator test result. He testified that the accuracy of the reading on the simulator does not affect the accuracy of the breath test results.

Mooney's opinion was that respondent's test record accurately reflected that respondent had an alcohol concentration of .12. He also believed that Sievert performed the test in accordance with the standards and procedures which he was taught at the BCA.

Dr. Richard Jensen, an analytical chemist who was formerly an assistant director with the BCA, testified for respondent. He said the purpose of running a standard is to determine whether or not the machine is in calibration, and whether everything is functioning properly. The calibration standard is in the middle of the sequence for a reason; it shows the time the unknown was measured, that the device was operating properly, and that it was in proper calibration.

Jensen did not know whether the cause of the low simulator was due to a problem other than one with the hose connecting the simulator. He did not know whether the machine was malfunctioning. In his opinion, the test was invalid.

Jensen agreed that the other calibration standards on the same instrument indicated it was working properly. He said he had no reason to believe that the readings of .110 on the simulator solution obtained shortly after the subject tests were in error, or that the instrument was not operating properly when the tests were run.

Jensen agreed that a loose connection would not affect the accuracy of respon-

---

1. ACA stands for air blank, calibration, and air blank.

dent's two samples if the machine was operating properly.

The trial court rescinded the revocation of respondent's driving privileges. It held that the Commissioner failed to present a satisfactory prima facie showing that the test procedure used was reliable. The Commissioner appeals from the trial court's order.

## ISSUE

Did the trial court err in finding that the Commissioner failed to present a prima facie case showing that the testing procedure used in this instance was reliable?

## ANALYSIS

■ A trial court's decision to exclude evidence for lack of foundation is within its discretion, and it will not be reversed unless justice requires. *Bisbee v. Ruppert,* 306 Minn. 39, 44, 235 N.W.2d 364, 368 (1975); *Tate v. Commissioner of Public Safety,* 356 N.W.2d 766, 767 (Minn.Ct.App. 1984).

■ Conclusions of law, on the other hand, can be overturned upon a showing that the trial court has erroneously ·construed and applied the law to the facts of the case. *See, e.g., State v. Kvam,* 336 N.W.2d 525 (Minn.1983); *State v. Speak,* 339 N.W.2d 741 (Minn.1983); *State v. Olson,* 342 N.W.2d 638 (Minn.Ct.App.1984).

It is well settled that a "proponent of a chemical or scientific test must establish that the test itself is reliable and that its administration in the particular instance conformed to the procedure necessary to ensure reliability." *State v. Dille,* 258 N.W.2d 565, 567 (Minn.1977).

In *Noren v. Commissioner of Public Safety,* 363 N.W.2d 315 (Minn.Ct.App. 1985), this court held that a low simulator result would not invalidate test results without some indication that the low readings unduly exaggerated respondent's test result, and that it was not sufficient to merely speculate about the meaning of a low reading. *Noren,* 363 N.W.2d at 318.

Here, there is nothing in the record to suggest that the Intoxilyzer machine itself was malfunctioning. The simulator solution was provided by the BCA and certified to have an alcohol concentration of .11. When the Intoxilyzer was connected to the simulator and produced invalid readings of .052 and .052, the officer immediately checked the fit of the plastic hose connecting the simulator to the Intoxilyzer and found it to be loose. When he cut off the end of the hose and refit it, the machine read out the exact alcohol concentration of the solution. It is undisputed that he followed BCA procedures in administering the test. The only explanation offered for the invalid reading of the simulator solution was that the loose connection caused the problem, not the machine. Neither expert could think of a possible alternative explanation. Respondent's expert, Dr. Jensen, left the BCA just at the time the first Intoxilyzer 5000 was put in service and he had no knowledge what training Officer Sievert was given in the use of the machine. His opinion that the test was invalid was based on his belief that the whole test should have been rerun. He did not know what the BCA taught in this regard and did not refute the state's expert that Sievert followed correct procedures.

■ After the state presented testimony that Officer Sievert followed testing procedures, including one of the two approved procedures for dealing with improper simulator results, and corrected the problem, respondent was required to go forward with evidence to show that the test was invalid. *Scheper v. Commissioner of Public Safety,* 380 N.W.2d 222, 224 (Minn. 1986). There was no testimony to show that respondent's breath samples were invalid.

The conclusion of respondent's expert that the test was invalid is not supported by facts.

## DECISION

The trial court erred in finding that the Commissioner did not make a prima facie showing that respondent's breath test reli-

ably disclosed an alcohol concentration of over .10.

Reversed.